IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY ) <br> COMMISSION, ) <br>  ) <br> Plaintiff, ) <br>  ) <br> v. ) <br>  ) <br>  ) <br> HUNTINGTON INGALLS INDUSTRIES, ) <br> INC., d/b/a HUNTINGTON INGALLS ) <br> INCORPORATED, and NSC ) <br> TECHNOLOGIES, LLC ) <br>  ) <br> Defendants. ) | CIVIL ACTION NO. <br><br><br> JURY TRIAL DEMAND |

## COMPLAINT

## NATURE OF THE ACTION

This is an action under Title VII of the Civil Rights Act of 1964, *as amended*, 42 U.S.C. §2000e *et seq*. ("Title VII"), and Title I of the Civil Rights Act of 1991, 42 U.S.C. §1981a, to correct unlawful employment practices on the basis of sex (female) and to provide appropriate relief to Victoria Sellers and Shontell Coleman (collectively referred to as "Charging Parties") and a class of female employees (collectively referred to as "the Class") who were adversely affected by such practices. As alleged with greater particularity in paragraphs fourteen (14) through twenty-three (23) below, Defendants Huntington Ingalls Industries, Inc., d/b/a Huntington Ingalls Incorporated ("HI") and NSC Technologies, LLC ("NSC") (collectively referred to as "Defendants") subjected Charging Parties and the Class to harassment because of sex. Defendants

also unlawfully retaliated against Victoria Sellers by terminating her employment for opposing the sexual harassment and Defendant HI retaliated against Shontell Coleman when its supervisor threatened her life because she opposed his unlawful conduct.

## JURISDICTION AND VENUE

1.      Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 451, 1331, 1337, 1343 and 1345. This action is authorized and instituted pursuant to Sections 706(f)(1) and (3) of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. Sections 2000e-5(f)(1) ("Title VII"), and Section 102 of the Civil Rights Act of 1991, 42 U.S.C. 1981a.

2.      The employment practices alleged to be unlawful were committed within the jurisdiction of the Southern Division of the United States District Court for the Southern District of Alabama, and employment records relevant to such practices are maintained and administered in this jurisdiction.

## PARTIES

3.      Plaintiff, the Equal Employment Opportunity Commission (the "Commission"), is the agency of the United States of America charged with the administration, interpretation and enforcement of Title VII, and is expressly authorized to bring this action by Section 706(f)(1) and (3) of Title VII, 42 U.S.C. Section 2000e-5(f)(1) and (3).

4.      At all relevant times, NSC has continuously been a Virginia limited liability company doing business in the State of Alabama and has continuously had over 15 employees.

5.      At all relevant times, Huntington Ingalls Industries, Inc. has been a Delaware corporation doing business in Alabama and has continuously had over 15 employees.

6. At all relevant times, Defendants have continuously been employers engaged in an industry affecting commerce within the meaning of Sections 701(b), (g) and (h) of Title VII, 42 U.S.C. §§ 2000e(b), (g) and (h).

## ADMINISTRATIVE PROCEDURES

7. More than thirty days prior to the institution of this lawsuit, Charging Parties each filed a charge with the Commission alleging violations of Title VII by Defendants.

8. On May 11, 2021, the Commission issued to Defendants Letters of Determination finding reasonable cause to believe that Title VII was violated and inviting Defendants to join the Commission in informal methods of conciliation to endeavor to eliminate the unlawful employment practices and provide appropriate relief.

9. In its efforts to conciliate, the Commission engaged in communications with Defendants to provide it with the opportunity to remedy the discriminatory practices described in the Letters of Determination. The Commission was unable to secure from Defendants a conciliation agreement acceptable to the Commission.

10. On August 19, 2021, the Commission issued to HI a Notice of Failure of Conciliation regarding each charge advising Defendant that the Commission was unable to secure from Defendant conciliation agreements acceptable to the Commission.

11. On August 26, 2021, the Commission issued to NSC a Notice of Failure of Conciliation regarding each charge advising Defendant that the Commission was unable to secure from Defendant conciliation agreements acceptable to the Commission.

12. All conditions precedent to the institution of this lawsuit have been fulfilled.

## STATEMENT OF CLAIMS

13. From at least as early as September 2017, and continuing until May 2018, Defendants have engaged in unlawful employment practices in violation of Section 703(a) of Title VII, 42 U.S.C. § 2000e-2(a) and Section 704(a) of Title VII, 42 U.S.C. § 2000e-3(a).

14. Specifically, Defendants subjected Charging Parties and the Class to severe, pervasive, unwanted, humiliating, degrading and offensive sexual conduct, including sexual assault, based on their sex (female), while they were employed by NSC and HI and assigned to work at HI's Pascagoula, Mississippi shipyard.

15. The unlawful sexual harassment was perpetrated by a supervisor employed by HI, Patrick Dingle ("Dingle"). Dingle was the Superintendent on the Coast Guard 7 ship where Charging Parties and the Class were assigned to work on a cleaning crew.

16. The sexual harassment included, but was not limited to, the following sexually charged conduct that created a hostile work environment based on sex:

   a. On an ongoing and continual basis, Dingle made unwelcomed sexual comments about the Charging Parties, the Class and other female employees, and about their bodies, groped them, exposed his penis, and masturbated in front of them. He also told Charging Parties and members of the Class that their jobs were dependent upon them having sex with him or that they could be promoted if they had sex with him.

   b. On or around November 13, 2017, Dingle forced Coleman to have sex with him. Dingle threatened Coleman that she could only continue to work if she had sex with him. Specifically, Dingle took Coleman to a washroom on the ship and said it was his ship and she needed to "get with the program." When she asked him "what program?" he said she had to "f**k me to keep your job" and forced her to have sex with him.

4

c.    Dingle made sexual comments to Coleman multiple times daily such as "you look so fine in those jeans;" or "you fine as a mother-f**ker; you wearing them jeans aren't you;" or "ooo that ass so fat, if I could touch that" or "I had to come see your sexy ass; you so fine." Dingle would grab her buttocks and say, "Let me just touch it." Coleman did not welcome this conduct.

d.    Dingle made similar comments to Sellers when she entered the ship to work each morning and multiple times throughout the workday. He made comments such as, "y'all fine; sure are some pretty looking women" or "let me eat that p*ssy one time" or "I sure would like to taste that" or "booty looking big today in them pants" or "oh, I sure like to taste that p*ssy" or "when you gonna let me take you out." Dingle called her "honey" or "sweetheart" rather than address her by her name. Sellers did not welcome this conduct.

e.    Dingle masturbated in front of Coleman on at least three occasions and in front of Sellers on at least one occasion. On one occasion, Dingle summoned Coleman to a storeroom and Sellers came with her for protection. When they entered, Dingle had already exposed his penis and was masturbating.

f.    On multiple occasions, Dingle looked at Sellers and the Class in a sexual manner while pulling his pants tight across his groin to show his penis was erect or while touching his penis.

g.    Dingle told a member of the Class that she could only keep her job if she had sex with him. He also told her she could be promoted to a supervisor if she would have sex with him. Dingle rubbed against her and grabbed her buttocks. Dingle masturbated in front of her and said, "You know you want this dick," and "I can make you leave your husband." This Class member was also aware of Dingle constantly sexually harassing other female employees in the same manner, including pressuring them to have sex with him. This Class member did not welcome this

5

conduct.

h.    Dingle sought out Charging Parties and the Class when they were working alone or working only with other females whom he had previously harassed so he could touch them or make sexual comments without interference.

i.    Charging Parties and the Class were aware that Dingle had an ongoing sexual relationship with another female employee of NSC assigned to their cleaning crew, April Mitchell ("Mitchell"). Dingle and Mitchell would often have sex in the Captain's room. Mitchell once questioned Coleman how to give oral sex because Dingle demanded it. Charging Parties would cover Mitchell's cleaning duties while she had sex with Dingle because it temporarily kept Dingle from sexually harassing them. Defendants were aware of Dingle's sexual misconduct with and toward Mitchell and other female employees but did nothing to stop it. Dingle's conduct was open and pervasive and well-known to Defendants.

j.    Charging Parties and the Class were afraid to work around Dingle and told their immediate supervisor, James Willis ("Willis"). Willis was hired by NSC and assigned as the lead cleaning crew member at the shipyard. If they knew they had to work around Dingle, Charging Parties went together or asked Willis to work closely with them to protect themselves from Dingle. Willis was well aware of how Dingle harassed the Charging Parties and the Class.

k.    Following a work break during December 2017, the NSC cleaning crew returned to work at the shipyard. Willis remarked to Coleman that she had "made the cut" to return to work. Coleman reported to Willis that Dingle forced her to have sex to keep her job. Willis replied, "Sometimes you have to do what you have to do to keep your job."

l.    Willis reported Coleman's complaint to NSC's Branch Manager, Ty Collard. Collard took no action to investigate Coleman's complaint and told Willis his concern was NSC

keeping its contract with HI.

m.   On or around April 5, 2018, Dingle followed Sellers into a room and said, "Oh I got you by myself now." He pinned her to the corner of the room and groped her. He told her, "You are going to have to give me some of that p*ssy if you want to keep your job." Coleman walked in and witnessed this event. Sellers refused to have sex with Dingle.

n.   Later the same day, Dingle demanded to replace Sellers on the cleaning crew and requested Mitchell take her place. Defendants unlawfully retaliated against Sellers by terminating her employment after she refused to have sex with Dingle.

o.   On or around April 6, 2018, Sellers reported Dingle's harassment to NSC Recruiter Alexandria Rucker ("Rucker"). In addition to complaining that she had been fired for refusing to have sex with Dingle, Sellers reported that Dingle had previously sexually assaulted Coleman and told Coleman she had to have sex with him in order to keep her job. Sellers also asked Rucker how to contact Collard so she could report the harassment. Rucker acknowledged that she knew other female employees had made similar complaints but that there was nothing she could do and emphasized that Sellers should not do anything that would cause NSC to lose its contract with HI. Rucker refused to give Sellers a phone number to reach Collard. Sellers got Collard's number from Willis and reported to Collard the same complaints she had told Rucker. Collard reiterated it was important not to lose the contract and did not take any action to investigate or otherwise protect the female employees still working at HI under Dingle.

p.   After seeing that NSC would not protect them, Sellers contacted HI's Human Resources Department where she first learned there was a hotline available. Sellers reported these same complaints to the HI hotline.

q.   On or around April 12, 2018, Coleman called the HI hotline to report that, on a near

7

daily basis since Sellers called the hotline on April 6, 2018 Jason LNU, who was Dingle's boss, had retaliated against her because she was a witness to Dingle's harassment of Sellers. She also reported that starting from October or November 2017, Dingle had sexually harassed her and Sellers by inappropriately touching them and telling them they would lose their jobs if they did not engage in sexual relations with him.

r. Subsequently, Coleman called to follow up with the hotline several times, including to report that on April 19, 2018 Dingle continued to harass her by stating, "you still sexy than a mother**ker."

s. Dingle did not treat male employees on the Coast Guard 7 ship in the same manner that he treated female employees as described above.

17. After April 5, 2018, neither NSC nor HI rehired Sellers.

18. On April 24, 2018, Dingle called Coleman over and told her that he knew she had been talking too much about him and, "If I lose my job, b*tch, you gonna lose your life." Coleman immediately reported this threat to HI's hotline.

19. After Charging Parties complained to their immediate supervisor Willis about Dingle's sexual harassment, NSC took no action to investigate their complaints or protect them from continuing harassment.

20. After Charging Parties complained about Dingle to Rucker and Collard, NSC made no effort to investigate their complaints, interview other female employees to verify they were not also being harassed or notify HI that its high-level supervisor was sexually harassing female employees.

21. After Charging Parties reported Dingle to HI's hotline, HI permitted Dingle to continue to work around Coleman and other female employees, which allowed him to continue harassing them and gave him the opportunity to threaten Coleman's life.

22. In addition to failing to provide a workplace free from sexual harassment, Defendants also unlawfully retaliated against Sellers when they terminated her employment for opposing the unlawful sexual harassment.

23. HI also unlawfully retaliated against Coleman when its supervisor threatened her life because she opposed his unlawful conduct...

24. The effect of the practices complained of in paragraphs fourteen (14) through twenty-one (21) above has been to subject Charging Parties and the Class to a hostile work environment based on their sex (female).

25. The harassment described in paragraphs fourteen (14) through twenty-one (21) above was severe, ongoing, and pervasive.

26. Defendants knew or should have known Dingle was creating a hostile work environment as described in paragraphs fourteen (14) through twenty-one (21) but failed to take prompt, effective action to prevent or stop it.

25. The unlawful employment practices complained of in paragraphs fourteen (14) through twenty-three (23) above were intentional.

26. The unlawful employment practices complained of in paragraphs fourteen (14) through twenty-three (23) above were done with malice or with reckless indifference to the federally protected rights of Charging Parties and the Class.

## PRAYER FOR RELIEF

Wherefore, the Commission respectfully requests that this Court:

A. Grant a permanent injunction enjoining Defendants, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, from engaging in sexual harassment and retaliation.

B. Order Defendants to institute and carry out policies, practices, and programs which provide a workplace free from sexual harassment and retaliation, require employees, managers, and officers to undergo training on preventing and recognizing sexual harassment and retaliation, provide multiple avenues for employees and customers to report sexual harassment and retaliation, and train managers and officers to promptly act to remedy sexual harassment and retaliation.

C. Order Defendants to make whole Charging Parties and the Class, by providing, as appropriate, compensation for past and future nonpecuniary losses resulting from the unlawful practices complained of in paragraphs fourteen (14) through twenty-three (23) above, including emotional pain, suffering, inconvenience, loss of enjoyment of life, and humiliation, in amounts to be determined at trial.

D. Order Defendants to pay to Charging Parties and the Class punitive damages for its malicious and reckless conduct described in paragraphs fourteen (14) through twenty-three (23) above, in amounts to be determined at trial.

E. Order Defendants to make Sellers whole by providing appropriate backpay with prejudgment interest, and appropriate compensation for the past and future pecuniary losses resulting from their unlawful employment practices, including but not limited to relocation expenses, job search expenses, and other pecuniary losses, in amounts to be determined at trial.

F.  Order Defendants to provide other affirmative relief necessary to Sellers to eradicate the effects of their unlawful employment practices, including but not limited to reinstatement or front pay in lieu thereof.

G.  Grant such further relief as the Court deems necessary and proper in the public interest.

H.  Award the Commission its costs of this action.

## JURY TRIAL DEMAND

The Commission requests a jury trial on all questions of fact raised by its Complaint.

RESPECTFULLY SUBMITTED,

Gwendolyn Young Reams
Acting General Counsel

U.S. Equal Employment Opportunity Commission
131 M. Street E
Washington, DC 20507

MARSHA RUCKER (PA Bar No. 90041)
Regional Attorney
marsha.rucker@eeoc.gov

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
Birmingham District Office
Ridge Park Place, Suite 2000
1130 22nd Street, South
Birmingham, Alabama 35205
Telephone: (205) 651-7045